UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                    No. 96-4361

LESLIE S. SPRINKLE,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, District Judge.
(CR-95-55)

Submitted: May 30, 1997

Decided: June 17, 1997

Before HALL and MOTZ, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

Janet P. Welton, JANET P. WELTON, P.A., Charlotte, North Caro-
lina, for Appellant. Mark T. Calloway, United States Attorney, David
A. Brown, Assistant United States Attorney, Charlotte, North Caro-
lina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Leslie S. Sprinkle was convicted of embezzling funds from local 322 of the International Alliance of Theatrical Stage Employees (IATSE) while he was business agent for the union in violation of 29 U.S.C. § 501(c) (1994), as well as bank fraud, 18 U.S.C. § 1344 (1994). He appeals his 21-month sentence of imprisonment, alleging that the district court misapplied the sentencing guideline in determining the amount of loss. United States Sentencing Commission, Guidelines Manual, § 2B1.1(b) (Nov. 1995). Finding no error, we affirm.

As business agent for the union from 1990 to 1994, Sprinkle negotiated employment contracts for the union members, received payments from the employers and, with the union financial secretary, had access to the payroll account. In December 1991, Sprinkle opened a money market account for IATSE Local 322 (Theatrical Employees) at the same bank where the union maintained its payroll account. He initially deposited $10,000 of the union's money into the money market account ostensibly to earn extra interest. After a few months, Sprinkle began depositing money paid for union members' work into the money market account. In May 1992, Sprinkle changed the name of the account to Theatrical Employees Special Account. By the end of January 1994, Sprinkle had deposited checks payable to the union totaling $207,522 into the special account. Of that amount, $101,103 was disbursed on behalf of the union, while about $104,000 was disbursed on behalf of Sprinkle. About $30,000 was disbursed to Sprinkle in 1992 and about $70,000 was disbursed to him in 1993. Sprinkle reported income of $45,000 in 1992 and $54,000 in 1993. He acknowledged at trial that most of the reported income on his 1992 and 1993 returns was earned by his wife.

Sprinkle testified at trial that he closed the union money market account in May 1992 and opened a personal account, and that by mis-

2

take the original account number and tax identification number continued to be used by the bank. He said he began a private business called Theatrical Stage Employees in 1992, which was not incorporated and had no tax identification number. He testified that in 1993 he changed the name of his business to Stage Services, Incorporated. Sprinkle testified that the money he used for himself from the special account was either the 3% commission he had earned for negotiating contracts, or was extra pay he had negotiated for himself from the production companies which employed the union members, or was reimbursement for expenses or for cash payments he had personally made to union members for work they performed. He said he had reported the extra income on his tax returns. However, the prosecutor introduced copies of Sprinkle's 1992 and 1993 tax returns, which showed no extra business income. Sprinkle then said he had recently filed amended returns. Although one of two FBI agents who interviewed him during the investigation had previously testified that Sprinkle admitted taking the money because he was experiencing financial difficulties, Sprinkle denied making such a statement.

Sprinkle presented expert testimony from Lewis McKnight, an accountant and auditor who "tested" certain samples of the transactions in the account and concluded that no fraud had occurred. McKnight admitted that he accepted Sprinkle's representation that the special account was an account he maintained for his personal business. Another witness for Sprinkle was Richard Pope, an accountant who prepared the union's 1993 tax return. Pope concluded that the only loss the union could report on its tax return as a result of Sprinkle's conduct was $6884 in "theft loss," because the $67,919 Sprinkle paid to himself came from "fees from clients" which was "reimbursement for wages, payroll taxes," and the like, none of which was intended to produce revenue for the union.

After Sprinkle's conviction, the probation officer calculated a loss of $94,310[1] and recommended an eight-level enhancement under USSG § 2B1.1(b)(1) (loss between $70,000 and $120,000). Sprinkle made no objection to the loss calculation. At sentencing, the district court questioned whether the union had suffered any loss, but ultimately decided that the probation officer's calculation was correct.

---

**1** The union was reimbursed $10,000 by its bonding company.

Although Sprinkle did not object to the loss enhancement, the issue was raised by the court at sentencing and argued perfunctorily by the parties. Consequently, it appears that the district court's decision should be reviewed for clear error rather than for plain error. In an embezzlement case, the district court need only make a reasonable estimate of the loss, given the available information. USSG § 2B1.1, comment. (n.3).

Sprinkle argues that the enhancement was not warranted because there was no evidence that the union lost any money at all, much less an amount over $7000, the amount accountant Pope said the union could claim as a loss on its 1993 tax return. The question is how much Sprinkle took in excess of what he was authorized to be paid by the union in 1992 and 1993. It appears reasonably clear that the amount was over $70,000.

For 1992, Agent Thomure testified that Sprinkle took about $30,000 from the special account. For 1993, Agent Thomure testified that Sprinkle took about $70,000 from the special account. Pope states that the total amount received from employers in 1993 was $418,609.[2] Eighteen percent of that amount (the surcharge) would be $275,349. If Sprinkle earned 3.55% of that amount, he was entitled to $2674. But Pope shows "disbursements on behalf of Sprinkle" as $67,919. This was the amount that was "allegedly stolen," as the union informed Pope, and presumably did not include wages or other pay which Sprinkle received in the normal manner. His explanation that he had negotiated extra pay for himself or had reimbursed himself for cash outlays is far-fetched because the discrepancy is so large.

In addition, the district court was aware that the FBI agent who interviewed Sprinkle testified that Sprinkle admitted taking money from the union for his personal benefit without justification. Whether the loss was suffered by the union or the employers, or both, we are satisfied that the government showed by a preponderance of the evidence that in 1992 and 1993 Sprinkle paid himself over $70,000 from the special account which he did not report as income and could not

_____

[2] Sprinkle testified that it was $900,000. Pope's information came from the union.

4

coherently explain at trial. Consequently, the eight-level enhancement was not clear error.

We therefore affirm the sentence. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED